All rise. The United States Court of Appeals for the Federal Circuit is now open for discussion. God save the United States and its honorable court. Please be seated. Good morning, ladies and gentlemen.  Two from the PTAB, two from the Veterans Court, and one from the District Court. One of the veterans cases is being submitted on the briefs and not argued. First case is 2020-11-84, Moderna v. Arbutus. Ms. Wigmore, I want to tell you how to argue your case, but I assume you'll begin with standing. What you are doing in front of us right now. Good morning, Your Honor, and may it please the court. My name is Amy Wigmore, and together with my colleague, Catherine Keecafer, I represent the appellate and cross-appellee ModernaTX, Inc. This case involves an inter-parties review proceeding addressing Arbutus' 435 patent on lipid formulations for nucleic acid delivery. Now, there are a number of legal errors that infected that proceeding, but given the court's statement, I will begin with the issue of standing. Moderna had and continues to have standing to pursue this appeal. At the outset, when this appeal was filed in November of 2019, there was a series of sub-licenses that Moderna had from Acuitas, which had sub-licensed these patents, including the 435, from Arbutus' predecessor. Those sub-licenses applied to four different targets, and at the time that the appeal was filed, there was active development going on with respect to one of those targets, RSV. Now, this court has recognized that standing can be established in a number of ways. One of those ways, of course, is the concrete activity leading to a possible infringement suit. That was not the basis for standing at the time this appeal was filed. The basis was contractual rights that are affected by a determination of patent validity, and the JTAC case by this court recognizes that basis for standing. As of November 19, 2019, Moderna had these sub-licenses in place, and it had already paid milestone payments under the licenses. How much time had, my recollection is it had been about five years since a milestone payment had been made, right? It had been several years since the original milestone payments had been made, but at the time... But any milestone payments. The last milestone payment that was made prior to the filing of the complaint was when? I don't have that specific date, but it is correct that it was not within a year of the appeal being filed. That said, there was an active development program with a third party for this RSV target, and the license was very much still in place. All four sub-licenses were still in place. These programs had not been abandoned. Well, if you're licensed, what's the threat of infringement? There does not need to be a threat of infringement under this court's precedent in the JTEC case. There needs to be contractual rights that are implicated by patent validity. And the issue here was there were potential future milestone and other royalty payment obligations in connection with those programs, the four viral targets that had been sub-licensed. In addition, Moderna had the right to sub-license these programs to third parties. And the impact of having to pay these royalty obligations was something that would impact their ability to sub-license them. Part of the problem is the weak evidence that you submitted with respect to the likelihood of these payments being affected. So you've got testimony that says if and when there's a Phase II clinical trial, but no testimony that says we're anticipating it within some period of time, we're working toward that. And in this case, there are multiple patents, and there's nothing that says this particular patent is what was driving the milestone payments. And so how do you fill that gap? Your Honor, this is a case that is very much distinguishable from the Apple versus Qualcomm case, which was cited by Arbutus in their briefing. In that case, Apple had attempted to argue standing based on the possibility of some future royalty payment. They had a license, but they had settled two infringement cases with a global settlement. They also submitted what the Court referred to as an incredibly sparse declaration, and the only issue there was whether within six or eight years after this license agreement, settling all the infringement litigation expired, could there be potentially some financial obligation. This case is much different. There's a detailed set of declarations that were submitted by Sean Ryan, Vice President and General Counsel of Moderna. Can I interrupt you for a minute? I think the problem here is immediacy. How do you show the immediacy specifically? Just forget about the other cases for a minute. With respect to standing in IPR proceedings, it is true that the injury in fact requirement remains. But because there's statutory right to appeal under 35 U.S.C. 141C, the requirements for immediacy or traceability and redressability are more relaxed in this context due to the statutory ability to appeal. In this case, there was an ongoing development program at the time the appeal was filed with another party. To the extent that development program led to a phase two trial, there would be further obligations owed. That is concrete and that is the type of activity the court has recognized it can be current or even future activity that can implicate standing. I understand that there was probably some concerns about confidentiality and not giving too much information, but my concern is still with the too little information. You said there's a detailed affidavit, but it's pretty vague. The affidavit describes the existence of this development program, if successful, would have led to further royalty payments. That was the situation in November of 2019 when this appeal was filed. Now, the situation has evolved and it's this court's obligation not just to look at standing at the time the appeal is filed, but whether there's an ongoing live case or controversy. And it is true that facts have evolved. Well, you still have to have standing as of the time the case is filed. Absolutely. So to what extent do you believe there's authority for the proposition that subsequent events can reflect on the nature of standing when it's filed? The initial existence of the sublicense is sufficient. It was a concrete program. There was a concrete development effort being undergone, at least with respect to RSV. And that was something that was actually actively being worked on. That is a concrete plan that the company had at the time. And that development program was subject to royalty payments. In addition, there is this ability to sublicense, which was burdened as set forth in the Ryan Declaration by these royalty payments. Can I interrupt you for a minute? So do I understand you to be saying that the initial basis for standing would be based on those plans and the license, the plans to develop something,  but that at least provided the initial basis for standing and that at some point it evolved? I guess as your client created the vaccine, it evolved to a different basis for standing? I wouldn't say a different basis for standing. I would say that that evolution keeps this controversy alive. Standing is assessed at the time the appeal is filed. And at that time, there was this active program under the sublicense that had a royalty burden. Over time, as set forth in our supplemental declaration, that particular RSV program was not pursued. The sublicense is still in place. There's potential future development. But that particular program, which is very concrete at the time the appeal was filed, did change. Now, that said, at the same time, the COVID vaccine was developed and ultimately delivered to the market and commercialized. But those are all after the date. That activity is after the date on which the appeal was filed. It need not only look at standing at the time the appeal was filed, which here we're relying on the license and the active development program for standing as of November 2019. But we still need to evaluate whether there's a live controversy moving forward as the appeal is still pending. And there, we do have this COVID vaccine. If you're concerned about royalty, obligations, financial burdens under a license that you don't need, you could have terminated the license, couldn't you? There are two different situations here. With respect to the four targets of the sublicense, it's not disputed that those targets, as they were being developed at the time, were practicing the patent set issue. So there would have been a royalty burden had those patents not been invalidated. And that's what Mr. Ryan's declaration makes clear. As to the COVID vaccine, certainly it's a case that Moderna does not concede any infringement. And the case law makes clear when you need not concede infringement, nor need there be a specific threat of an infringement case. There needs to be concrete plans and activity that could lead to a possible infringement action. But it can't be so remote. I mean, you can't say that we had a license to do a bicycle and then we later did a car, and so therefore we're concerned about an infringement claim. So that is part of your problem. You're not arguing that the RSV program that you said was live somehow morphed into where we are now. You're arguing that they are completely separate and that the patents don't cover what's going on now. And so that's part of the problem. I understand what you're saying, but I think you're taking it too far. Now, in the Momenta case, this court recognized that the basis for standing and case or controversy are not necessarily coextensive. The court recognized that situations evolve and there's no question at the time this appeal was filed, there was an active licensing program that had royalty implications. Since that time, it's been a couple of years, there has been some change to that program. That license is still in place, but there's no more development of that one particular RSV vaccine under that license. But there has been this change in circumstances where the COVID vaccine, COVID didn't even exist and at that time, we were not relying on the risk of infringement, but now it's a concrete... But you really only discussed those activities in connection with the other appeal, right? There's nothing in this first appeal where I see that discussion of the development of the COVID vaccine as something you were relying upon. We did supplement the record, Your Honor, it's docket number, I think it's 118, where we put in the Ryan declaration in the original. We put it into this appeal not only to advise the court of this ongoing live controversy, but also to advise the court that the development program we had been discussing in the original declaration at the time of the appeal being filed, that that program had changed. And so... Counsel, do you want to spend a few minutes on the merits? Absolutely. And we'll make sure you get some rebuttal tonight. Okay, thank you. So in terms of the merits, there's a fundamental legal flaw of the IPR decision, and that is the court failed to apply the proper framework and shift the burden of production to Arbutus. There are overlapping ranges in the prior art that the board failed to recognize. In addition, the board failed to adequately explain its decision. It had a little over two pages of a 51-page opinion addressing the issue of obviousness. It did not properly analyze this legal framework or apply it, nor did it adequately explain its decision. Now, in terms of the ranges that were disclosed in the prior art, these patents, this 435 patent addresses a composition containing four categories of lipids, conjugated lipids, cationic lipids, and two non-cationic lipids, cholesterol and phospholipid. These are the ranges of the three categories. Just to make sure I'm being clear here, are you addressing primarily the claims other than Claim 7 and Claim 8? We are addressing all of the claims because the error was fundamental when the court turned from anticipation, which it found for some of the claims, to obviousness. With respect to all the claims it was analyzing for obviousness that had not been anticipated, it failed to apply this burden-shifting framework. These ranges... There are some claims that are, if I remember correctly, there are some claims that don't have the phospholipid in them, right? They have cholesterol, and the court made the same error with respect to cholesterol. In fact, an even greater error because it said in its opinion that the cholesterol range was not disclosed when even Arbutus concedes that the prior art discloses a 20 to 45 percent range of cholesterol. So is it your view that what we should do if we reach the merits is not reverse, but to make it in remand so that the burden-shifting can apply and the board can consider it under that standard? That's correct. It was a fundamental error not to shift the burden and to impose upon Moderna the obligation to prove motivation to optimize. Motivation to optimize is presumed when there's an overlapping range, and based on the description we provided in our brief, there was a clear overlap. That overlapping range need not be stated in haec verba or verbatim in the prior art here. It was with respect to three of the four lipids at issue. Those ranges were explicitly described, and there can be no question they overlap with what's in the claims. And so the case law on this says it can be either overlapping or encompassed. That is, the prior art ranges can either overlap with the claim range or encompass the claim range. That's correct. The presumption applies. All you need is a slight overlap. The N. Ray Peterson case makes that clear as do other cases. This case is squarely on point with the DuPont case that this court decided it was also an IPR where a non-obviousness finding was reversed. Here, there are multiple variables, but the DuPont case recognized that those can form the basis of an overlapping range presumption. The fundamental error here... Was there anything in the record, I mean, putting aside whether they should have formally shifted the burden, is there anything in the record that would indicate that the narrower range or the specific range was somehow surprising or somehow different from what the prior art showed? The basis for their patent, they allege, is this amount of cationic lipid above 50%. But the prior art, including the 554 publication and the 189 publication, both expressly disclose a cationic lipid range of up to 60%. That's the fundamental issue here. 60% cationic lipid is in the prior art and so it cannot be the basis for distinguishing this patent from the prior art. Counsel, let's hear from the other side and we'll give you three minutes for rebuttal. Mr. Burrell. Good morning, Your Honors. David Burrell for Arbutus. I'll start where my opponent started with regard to the issue of standing. And what's missing here are multiple things. First, any notion of immediacy is entirely absent from the evidence that Moderna has presented to this court. It is speculative and today we've heard for the first time that they admit that this RSV vaccine program, which was the basis for their standing as of notice of appeal, November 2019, has been abandoned. So they've now shifted. But we need to look at November 2019. Indeed. So why is the fact that it was at least ongoing at that point and there was an intention to move forward with it at that point? Why isn't that enough? Here's what's missing. And the key cases here are the Samsung case in which multiple patents were licensed and standing was found and the Apple v. Qualcomm case where multiple patents were licensed and standing was not found. And the difference is crucial here. In Samsung, this court found that the invalidation of the patent at issue in that case would have changed the royalty obligation because of the way the patent pool worked. If you eliminate one patent, more money would be paid on other patents so Samsung would have profited. That was missing in Apple v. Qualcomm where this court found that Apple presented no evidence that the invalidation of the particular patents it was challenging would change its royalty obligations. That evidence is missing here too. If you look at Mr. Ryan's declaration, he addresses this at A5745-46 and he acknowledges that Moderna here has licensed numerous patents, not just the 435 and 069, numerous patents. Those patents are found at Exhibit D to his declaration at A58-28-69. It's actually in the other appendix because they supplemented it. And what you see there are 40 pages of patents. These are two of them, only one at issue in this appeal. Well, patent portfolio licensing is pretty normal. So assuming that patent portfolio license is normal, can't a clinical trial or ultimately a product read on a number of patents in a portfolio? It could, but the crucial question under the Apple Qualcomm case is whether the requested relief, here the invalidation of the 435 patent, would affect the payment obligation for Moderna. And there's no evidence from Mr. Ryan that it would. There's no evidence unlike the Samsung case that says if the 435 patent is invalidated and we had continued this RSV program, we would have owed Arbutus less money. We've said you don't have to admit infringement in order to establish standing. That's not a question of admitting infringement. It's a question of whether the requested relief would affect their payments under the license. So whether they infringe or not, let's assume for a moment that they would. Best case scenario for their standing case, there's no evidence that if you take out the 435 patent that they owe one red cent less if they would have progressed their RSV program because they have to pay on all of the patents. So the elimination of one or two of them doesn't change their royalty obligation. They have to show evidence under the Apple Qualcomm case that it does. Moderna's... Your point, I think the point of your argument is that that makes it less concrete, less likely to occur combined with the fact that it was also there had been a lot of times that milestone payments had been made anyway. So it was a little bit less concrete that they would even... This product would come to fruition and they would have to pay any milestone payments. Absolutely. And even if they did have to pay milestones, which again is not concrete and speculative, there's no evidence that the requested relief would have redressed in any way their obligations. They would have paid exactly the same amount under the evidence that they have advanced. And the Apple Qualcomm case says this defeats injury in fact under the immune analysis. And so you can't have a situation where you have a bunch of licenses that are to 40 pages of licenses without 40 pages of patents without any evidence and they have an absence of proof here. You can read the Ryan Declaration front to back. You won't see any evidence that invalidation of the 435 patent or for that matter the 069 patent in the next case affects their payment obligations. And the Apple Qualcomm case said that... Are you saying that... Are you saying that they need where you have those multiple patents that they essentially would need to establish that infringement would occur based on the ongoing program or are you saying they need to establish that not only would infringement likely occur but that it wouldn't occur with respect to the other patents? That would be one way of solving the Apple versus Qualcomm problem. If they had advanced that sort of evidence that said we don't infringe the other 40 pages of patents so therefore invalidation of the 435 would mean we don't have to pay any royalties if we progress this RSV vaccine. That sort of evidence would have been sufficient under Apple Qualcomm. They don't say that. What Moderna  they cite the Shen Yang case for the proposition that eliminating the 435 would eliminate a major obstacle for them consistent with their payment obligations but that was addressed also in the Apple versus Qualcomm case. Footnote 4 of that case says that Apple doesn't present any evidence as to why invalidation of this one patent would remove a major obstacle. For example, they could have said if the 435 patent is invalidated that would mean all of these other patents also would be invalid so we wouldn't have to pay or we don't infringe the other patents so that's really the major obstacle but they have no evidence of any of that and so just like Apple Qualcomm which I would submit is on all fours of this case with respect to the pool of patents and the absence of evidence that the payment obligations would be affected by the requested relief I would say respectfully resolves the standing issue here. Isn't that a bit of a catch 22 though? I mean you have to basically say that you're liable in order to have standing? No, you could have said exactly what your honors suggested. They could have said we challenge the 435 patent we don't infringe the other 39 pages of patents so therefore invalidation of the 435 patent would remove any payment obligations even if we did infringe. We agree. They don't have to admit infringement but they do have to show some imminent threat here of having to pay their royalty for their activities. They admit that they had no threat when they filed this notice of appeal with respect to COVID. They admit that at some point after their last payment obligation which was back in 2016 was made that they abandoned their RSV program that's relevant to this patent. We have no evidence of when that happened versus when their COVID vaccine came into being and recreated in their mind that imminent threat. There's no timeline that indicates that at all times they had an  But when the COVID vaccine program came up we probably had standing somewhere in that. It's good enough for government work. What do you make of the  and this goes to the question of the supplemental authority that post-filing activities are relevant? I thought post-filing activities are relevant not because they help to establish standing but because even with standing there might not be any case of controversy. Absolutely. I agree with your Honor's interpretation. It is a fundamental tenant of standing and frankly jurisdictional in Article 3 case law that at all points at every point including the filing of the notice of appeal and all points thereafter standing  present. Any gap one minute doesn't make a difference. Counsel do you want to address the merits? Happy to address the merits your Honor. This is a case in which the board made numerous factual findings that are explicitly relevant under this court's range case law that resolve this case conclusively. For example the board found that the various components disclosed in the prior are interrelated with each other in an unpredictable way. That is explicitly relevant under this court's applied materials. Why isn't that something that would be considered after the presumptions applied? It seems to me that once you have a prior reference that discloses the mold percentages for the ingredients in the claim that at that point the presumption applies and there should be some shifting. That seems to be the problem here. Let me address that in two ways. First the Horizon case does not stand for that proposition. In that case where the various components interacted unpredictably with each other as the board found here in an unchallenged factual finding no presumption was applied by the district court. None. And this court affirmed that finding. And Moderna's only response to that is that Horizon isn't a range case and somehow the active ingredient was not disclosed in the prior art as a range. That's not true. If you look at the district court case at star 5, it makes clear that the Kazai reference disclosed an overlapping range of dichlofenac sodium. Even if that's true, there's plenty of other cases that take a different approach. None of them suggest that in a situation where the various components of the prior art interact unpredictably with each other, a presumption is invoked. And I would suggest the applied materials case suggests exactly the opposite. Are you saying we should say that even though there is a clear overlap in the ranges, that just because there appears to be an interaction between the ingredients, that we ignore those overlaps? First of all, I don't think there's a clear disclosure of an overlap. How can 20 to 45 percent not overlap at least somewhat with 30 to 40 percent? It does, of course, but there's no disclosure of a phospholipid range anywhere in the prior art is that the range case law, whether it's DuPont or Applied Materials or any of the others, does not exist separate and apart from this Court's obviousness jurisprudence and the KSR obviousness jurisprudence. They're trying to get at the same thing and they can't be applied in a way that is abjectly defying KSR and all of the principles of obviousness. To take one example, in the DuPont case as well as the Peterson case that they cite, the Court observed that the issue here is do we have routine experimentation which leads to obviousness because you experiment routinely within the ranges or do we have the doctrine that can exist hermetically sealed from everything else in Section 103 and here the Board found repeatedly in an unchallenged factual finding that it would not be routine experimentation, that it would be difficult experimentation. Their own expert agrees that it would be difficult experimentation. So which side of the ledger are we on? Routine experimentation, as in DuPont, as in Peterson, or not routine experimentation  Genetics Institute and Horizon? The Board answered that question repeatedly and said that .               Can I just get permission? Marriage Lawyers should conduct it as is politically, legally and morally linked by the United States .